HOSODA & MORIKONE, LLC
LYLE S. HOSODA          3964-0
ADDISON D. BONNER    9163-0
500 Ala Moana Blvd., Ste. 3-499
Honolulu, Hawaii 96813
Telephone: (808) 524-3700
Facsimile: (808) 524-3838
Email:       lsh@hosodalaw.com
             adb@hosodalaw.com

ASHFORD & WRISTON
A Limited Liability Law Partnership, LLP
KEVIN W. HERRING     6722-0
JAE B. PARK             8172-0
BENJAMIN M. CREPS  9959-0
999 Bishop Street, Suite 1400
P.O. Box 131
Honolulu, Hawaii 96810
Telephone:  (808) 539-0400
Facsimile:  (808) 533-4945
Email:       kherring@awlaw.com
             jpark@awlaw.com
             bcreps@awlaw.com

Attorneys for Plaintiff
ENVY HAWAII LLC

EXHIBIT "I"

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ENVY HAWAII LLC *dba* VOLVO CARS HONOLULU, | CASE NO. CV 17-00040 KSC |
| Plaintiff, | **FIRST AMENDED COMPLAINT; SUMMONS** |
| vs. | |
| VOLVO CAR USA LLC, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Comes now, Plaintiff ENVY HAWAII LLC, *dba* VOLVO CARS HONOLULU, by and through its attorneys, hereby alleges and avers as follows:

### INTRODUCTION

1.     This case arises out of an automobile dealer-manufacturer relationship between Plaintiff-Dealer ENVY HAWAII LLC, *dba* VOLVO CARS HONOLULU ("Envy" or "Plaintiff") and Defendant-Manufacturer/Distributor VOLVO CAR USA LLC ("Volvo" or "Defendant").

2.     Envy brings this action against Volvo for damages resulting from Volvo's coercive and fraudulent business practices and violations of federal and State law, and seeks damages, costs of suit including reasonable attorneys' fees, and any other relief deemed appropriate.

2

## JURISDICTION AND VENUE

3.      This Court has Federal Question Jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1222 because this action arises under the Automobile Dealer's Day in Court Act ("ADDCA"), and other federal statutes.

4.      Pendant jurisdiction is based on 28 U.S.C. § 1367, and United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966), as the violation of the federal laws alleged herein is substantial and the pendent causes of actions derive from a common nucleus of operative facts.

5.      The Court has jurisdiction over Volvo, which is registered to conduct business in the state of Hawaii and transacted business in the state of Hawaii as described herein.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within, or a substantial part of the property that is the subject of the action is located in this judicial district.

## PARTIES

7.      Plaintiff ENVY HAWAII LLC *dba* VOLVO CARS HONOLULU ("Envy") is a Hawaii limited liability company duly registered to conduct business in the State of Hawaii and having its principal place of business in the City and County of Honolulu, State of Hawaii.

3

8.     Defendant VOLVO CAR USA LLC ("Volvo") is a Delaware limited liability company with its principal place of business in Rockleigh, New Jersey and is registered with the State of Hawaii as a foreign company - File No. 142816 C6. Volvo is the successor-in-interest to the business assets of its parent company, Volvo Cars of North America, LLC ("VCNA"), including all contracts referred to herein. Volvo and VCNA are wholly-owned subsidiaries of Volvo Car Corporation, the manufacturer of Volvo automobiles.  This First Amended Complaint shall use the word "Volvo" to refer to VOLVO CAR USA LLC, as the successor-in-interest with respect to all events occurring prior to January 1, 2016, and thereafter.  Volvo is engaged in the manufacture, distribution, marketing, and sale of vehicles under the brand name "Volvo."

9.     Volvo manufactures the vehicles sold to Envy and other vehicle dealers throughout the United States, including the state of Hawaii.

10.     At all relevant times herein, all of the vehicles that Envy purchased and/or received from Volvo crossed state lines between the time of their manufacture and their delivery to Envy.

## FACTUAL BACKGROUND

### A.     Background of Jackson Volvo and Envy Purchase

11.     In late 2012, Envy purchased the rights to a Volvo franchise from Jackson Auto Group and entered into an Authorized Retailer Agreement ("2012

ARA") with Volvo, which entitled Envy to sell Volvo vehicles in the state of Hawaii and operate as a Volvo franchise under the Volvo brand name.

12. At that time, Envy had a total of five managers.

13. With the purchase of Jackson Volvo, Envy became the sole retailer of new Volvo vehicles in the state of Hawaii, selling and servicing both new and used Volvo cars, and acquiring all new cars by and through Defendant Volvo.

14. Envy's retail showroom was and is currently located at 704 Ala Moana Boulevard in Honolulu, Hawaii.

15. On or about January 1, 2016, VCNA transitioned its business assets, including its existing contracts, to its successor-in-interest, Volvo.

16. In June 2016, Envy was asked to enter into a new Authorized Retailer Agreement with Volvo and on July 8, 2016 Envy executed a new Authorized Retailer Agreement ("2016 ARA").

**B.    Volvo Operations and Envy Franchise Relationship**

17. Volvo's business operations and sales program has divided its United States operations into districts based upon geographical regions ("Regions").

18. Each Region has been further divided into urban markets ("Markets").

19. Volvo utilized these Regions and Markets to deal directly with individual dealers located within their specified Region and Market, which had specific sales goals.

20.     At all times relevant herein, Envy's operations were included in Volvo's Western Region, Los Angeles South Market.

21.     As a worldwide manufacturer of Volvo vehicles, Volvo enjoys substantial economic power and leverage over its franchisee-dealers, such as Envy.

22.     Envy's dealership operations began on or about December 3, 2012.

23.     As a Volvo dealer, Envy was entitled to receive various manufacturer incentives and subsidies for the sale of Volvo vehicles. These incentives and subsidies are crucial for the survival of dealers such as Envy.

24.     As an example, Volvo would reward a dealer who classified a vehicle as a demonstration ("Demo") vehicle or a service loaner ("Service") within its overall vehicle fleet. As a result, dealers would be encouraged to maintain a higher number of Demo and Service Vehicles. Volvo would only provide the dealer with the promised incentive or subsidy to the dealer if the vehicle remained classified as a Demo or a Service Vehicle for a fixed amount of time, usually three to six months.

25.     When a new vehicle became classified as a Demo or a Service Vehicle, it lost its status as a "new" vehicle and the manufacturer's warranty period commenced.

26.     Once the vehicle has been classified as a Demo or Service vehicle for the required period of time, the dealer must later sell the vehicle as "used,"

resulting in additional expenses and losses to the dealer.

27.     Envy began its dealership operations in late 2012 and gradually

became more susceptible to Volvo's ongoing and threatening business practices.

## C.     Volvo's Coercive and Fraudulent "Punching" Scheme

28.     Upon information and belief, from 2013 and through to the present,

Volvo—through its regional and national managers—engaged in a pattern of

economic coercion against dealers throughout the United States and against Envy.

29.     Since this time, Volvo imposed an aggressive and unreasonable

inventory policy upon Envy (and franchisees across the country), to aid in Volvo's

scheme whereby Volvo artificially inflated quarter and year-end sales data; a

practice known in the industry as "punching" or "burning RDRs" ("Punching

Scheme").

30.     Punching is the means by which a manufacturer falsely reports (to

investors and the general public) dealer *deliveries* as consumer *sales*.

31.     Specifically, Volvo would demand and coerce its dealers and Envy to

"punch" or "RDR" brand new vehicles and reclassify them as Demo or Service

vehicles.  If a vehicle status changed from "new" to a Demo or Service vehicle,

Volvo would consider the vehicle to be "sold," thereby achieving elevated and

inflated sales numbers, which were subsequently reported to the general public.

32.     Volvo's Punching Scheme had the effect of prematurely commencing

7

consumer warranty periods, misleading the public and investors by creating the appearance of continued growth (without actually achieving the same), and forcing dealers to accept inventory well beyond actual market sales demand.

33.    Because the Punching Scheme prematurely commenced consumer warranty periods, Envy has been forced to provide supplemental warranty coverage at substantial expense to Envy, and in in a least one instance, the Punching Scheme has caused a legal dispute over warranty issues that currently exposes Envy to significant liability.

34.    Those dealers who refuse to participate in the Punching Scheme expose themselves to a reduction or complete withdrawal of certain discretionary funds from Volvo, *i.e.*, the dealer incentives and marketing funds upon which the financial survival of dealers like Envy depend.

35.    Volvo economically coerced Envy and dealers like it to engage in the Punching Scheme, as those dealers who comply with the fraudulent scheme are able to obtain discretionary funds and operate at a substantial economic advantage over the dealers that do not, thereby forcing the collective of dealerships to comply, or else be surpassed by the complying dealers.

36.    Since 2013, Volvo has conditioned substantial portions of Envy's financial incentives on its participation and compliance with its Punching Scheme.

37.    Since 2013, the Punching Scheme has inflated Envy's inventory by

forcing vehicles upon Envy irrespective of actual demand, causing a substantial increase in overhead and other expenses related borne solely by Envy.

38.     The Punching Scheme has further harmed Envy because Volvo, since 2013, has imposed increasingly unrealistic and unreasonable sales goals on Envy, goals that are based on Volvo's own inflated sales data.

39.     After this lawsuit was initially filed, the sales goal dropped from 329 units to 139 units, thereby confirming the existence and substantial impact of the Punching Scheme.

40.     The unrealistic sales goals further coerce dealers to engage in the Punching Scheme.

**D.     Increased Flooring Line Requirements and Resulting Expenses**

41.     As a requirement of the franchise relationship, Volvo requires its dealers to maintain a minimum line of credit with a financial institution ("Flooring Line") sufficient to cover the inventory of vehicles in dealer's possession, as well as other assets of the dealer.

42.     Over a three-year span and roughly commensurate with the Punching Scheme, Volvo increased Envy's Flooring Line requirement by an arbitrary and unreasonable 50% or more.

43.     In 2012, Envy maintained its initial Flooring Line with Bank of Hawaii ("BOH").

9

44.     In early 2013, Envy elected to change its Flooring Line lender to Bank of America ("BOA") due to a lower interest rate and less stringent lending requirements.

45.     In August of 2014, BOA determined that Envy would be placed on finance hold due to, *inter alia*, Envy's excessive and aggressive inventory, which was forced upon it as a direct result of Volvo's coercive Punching Scheme.

46.     As a result of the Flooring Line finance hold by BOA, Envy was forced to place a six month hold on all new car shipments from Volvo in an effort to clear vehicles from Envy's inventory so it could comply with BOA's financing requirements.

47.     During this time, Envy suffered significant financial loss because it was unable to accept new car shipments from Volvo and therefore could not obtain Volvo's dealer incentives and subsidies offered with new vehicle sales.  Envy suffered further financial damage as the finance hold prevented Envy from effectively operating its used car business.

48.     In November of 2014, Volvo demanded that Envy cure the BOA matter and issued a sixty-day notice of default under the 2012 ARA for failure to maintain adequate flooring for company vehicles.

49.     Envy quickly and diligently sought alternative financing solutions and on December 17, 2014, Volvo accepted Envy's proposal for a new vehicle

$1,000,000 Flooring Line with Westlake Financial.  At the same time however, Volvo also concluded that Envy's Flooring Line requirement for 2015 would be increased to $1,615,562.

50.     Therefore, Volvo required that Envy increase its Flooring Line to $1,615,562 within just a few weeks - by January 16, 2015.

51.     Volvo also cautioned and recommended that Envy obtain an even higher Flooring Line of $2,019,542, due to the "additional time and logistics involved in shipping cars to Honolulu."

52.     On or about February 5, 2015, Envy was able to obtain a new Flooring Line with BOH that was sufficient to meet Volvo's requirements.

53.     This BOH Flooring Line was significantly higher and resulted in increased costs to Envy.

54.      On or about January 27, 2016, BOH, like BOA, also determined that Envy would be placed on finance hold due to, *inter alia*, Envy's excessive and aggressive inventory, which was forced upon it as a direct result of Volvo's coercive Punching Scheme.

55.     At this point, Envy was unable to locate a local lender who would issue an adequate Flooring Line to Envy commensurate with Volvo's requirements.

56.     After diligent efforts to locate an alternate lender, Envy was forced to obtain financing from a third lender, NextGear Capital ("NextGear"), on

significantly less favorable terms.

57.     The NextGear Flooring Line increased Envy's interest rate from 2.65% to approximately 6% and increased Envy's Flooring Line expenses by approximately $20,000 per month.

58.     The NextGear Flooring Line also resulted in additional increased costs to Envy and was subject to the added requirement of a personal guaranty.

59.     On April 14, 2017 and due to Volvo's Punching Scheme, the NextGear Flooring Line matured and Envy was again placed on a financial hold.

60.     Due to Envy's excessive inventory and as a direct result of Volvo's Punching Scheme, Envy was forced to increase its liability insurance to cover its vehicle inventory.

61.     Envy's liability insurance premiums increased from approximately $75,000 in 2014, to $90,000 in 2015, to $110,000 in 2016 and then to more than $200,000 in 2017.

62.     Due to Envy's excessive inventory and as a direct result of Volvo's Punching Scheme, in mid-2016, Envy was forced to secure an additional inventory lot to accommodate its large vehicle inventory near its Honolulu dealership, at an additional expense of approximately $8,000 per month.

63.     Due to Envy's excessive inventory and as a direct result of Volvo's Punching Scheme, Envy's vehicle supply was significantly higher than the

applicable market demand and Envy suffered financial loss due to time-value depreciation of the vehicles lingering on Envy's lot.

**E.   Envy Partners Resign due to Volvo's Actions.**

64.   As a direct result of Volvo's coercive Punching Scheme, Volvo's threats of franchise termination, the resulting increased costs associated with Envy's Flooring Line and escalated business expenditures, four of the five Envy Managers sought to end their relationship with Envy either through terminating the business or selling it.

65.   After a diligent search, the Managers determined that the problems with Envy's Flooring Line and other matters prevented the business from being attractive to prospective purchasers and one partner was forced to buy out the others in effort to keep Envy from breaching multiple contracts and ceasing operations.

**F.   Ka Makana Ali`i Showroom Lease**

66.   Volvo required Envy to annually review and update its business plan, which must be submitted and approved by Volvo.

67.   At Volvo's request and urging, Envy's 2016 business plan incorporated an updated "mall-based" vehicle showroom.

68.   In early 2016 and as a result of Volvo's encouragement and requests, Envy pursued a new mall-based vehicle showroom and Envy began engaging in negotiations with two of Oahu's largest retail malls: Kahala Mall and Pearlridge

13

Shopping Center.

69.     Upon identifying a prime showroom location in Kahala Mall, Envy ultimately lost the Kahala Mall location due to the extended length of time it took for Volvo's agents to review and approve of the location.

70.     When Envy identified another prime location within the Pearlridge Shopping Center, Envy again lost the location due to the extended length of time it took for Volvo's agents to review and approve of the location.

71.     In April of 2016, Envy located a potential showroom space within the new Ka Makana Ali`i Mall ("KMA") located in Kapolei, Hawaii.

72.     The KMA location was attractive because it was a new shopping district within a fast-growing urban market.

73.     In the Spring of 2016, Envy executed a letter of intent ("LOI") with KMA and received Volvo's written approval to proceed with the KMA lease.

74.     On Volvo's recommendation, Envy created and filled a new key employee position to manage the KMA project and hired additional sales employees to ensure a smooth transition to open the KMA showroom.

75.     Envy expended monies by hiring consultants, contractors, architects, and other professionals to prepare business and showroom plans for the KMA showroom and in reliance upon Volvo's approval and encouragement of the KMA showroom.  Throughout the discussions regarding the KMA showroom and at all

14

relevant times, Envy kept Volvo apprised of the status of lease negotiations and the build out plans for the KMA showroom.

76.    In mid-2016, and after receiving written approval to proceed with the KMA showroom, Envy formally announced the new KMA showroom to its employees, customers, banks and vendors.

77.    While in discussions with Volvo regarding the KMA showroom, Volvo continuously expressed their concerns with Envy's used car business, Windward Motors.  Volvo representatives actively encouraged Envy to sell its Windward Motors assets and apply the profits to purchase more Volvo cars.

78.    At one point, Volvo's agents inspected the Windward Motors website, reviewed its inventory listed online, and concluded that a sale of the Windward Motors assets could result in a profit of approximately $2,000,000, which Envy could then apply to the purchase of additional Volvo cars.

79.    Volvo also informed Envy that the Windward Motors business carried too many high end vehicles and Envy would be required to "dump" them to meet Volvo's new car inventory requirements.

80.    As a requirement to receive Volvo's assistance (financial and otherwise) with the acquisition and development of the new KMA showroom and upon reliance on the assurances and representations made by Volvo and its agents, Envy disposed of its Windward Motors business.

81.     Shortly after Volvo approved the KMA project but before lease agreements were finalized, Volvo appointed a new Western Region Vice President, Mr. Michael Cottone.

82.     On or about July 2016, Mr. Cottone and Mr. Brad Moorhead informed Envy that it would not be allowed to proceed with the KMA showroom as a result of Envy's "poor performance" and financial status, which ultimately stemmed directly from Volvo's Punching Scheme.

83.     Volvo's last-minute withdrawal of support for, and unreasonable failure to consent to, the KMA showroom resulted in significant damages to Envy.

84.     Volvo's withdrawal of support caused Envy to have to break commitments made to multiple vendors, diminished Envy's profitability, caused Envy to lose several key employees, damaged Envy's reputation in the community, and stripped Envy of a critical revenue stream formerly flowing from its satellite used car lot.

## G.     Envy Rejects Volvo's Punching Scheme and Faces Retaliatory and Discriminatory Conduct

85.     Beginning in the fall of 2015, despite the potential of retaliatory action, Envy refused to participate further in Volvo's fraudulent Punching Scheme and demanded that Volvo address the significant and undue financial expenses caused to Envy by the Punching Scheme.

16

86.     Volvo ignored this demand and continued to maintain its practice of inducing and encouraging sales inflation to assist in its misleading quarterly sales reports.

87.     As one example of the sheer boldness of Volvo's sales inflation, the Daily Sales Report for Volvo's Western Region showed that on November 29, 2016 the month-to-date retail sales for the Chicago/Minnesota district totaled 169 sales; the very next day, November 30, the Daily Sales Report for this same region reported total retail sales of 366, which was more than double what the month totals had been just one day prior.

88.     As another example, at the end of December 2016, Volvo offered a "6-day demo program"—over those six days, in the Western Region alone (in which Envy is grouped), Volvo's dealerships were paid over $1.5 million in incentives for punching roughly 1,100 units—nationally, this would amount to at least 3,000 units for Volvo to report to investors as being sold to consumers in the final quarter of 2016 when in fact those units were not sold to consumers as reported.

89.     Because Volvo evaluates the performance of its dealers within regional markets, schemes like Volvo's "6-day demo program" creates an illusion of superior performance among punching dealers and harms the non-punching dealers who then face repercussions for their artificially induced "poor performance."

90.     Through a varied array of practices and acts, all of which crossed

interstate lines, Volvo has discriminated against Envy and treated Envy disparately from other dealer-franchisees in its market region and across the country in pricing, as well as various promotional allowances or promotional services intended to promote the resale of Volvo's products.

91.     Specific examples of Volvo's discriminatory and unlawful practices include:

(a)     Volvo charges Envy with higher purchase prices of vehicles and parts than that charged to other dealers within Envy's market region for vehicles and parts of like grade and quality;

(b)     Volvo has discriminated against Envy by requiring a significantly higher Flooring Line requirement resulting in significant financial harm to Envy, while allowing other dealers in Envy's regional market a much more lenient and lower cost Flooring Line requirement, thereby denying Envy with certain allowances or services;

(c)     Volvo has discriminated against Envy by limiting its reimbursement for vehicle transportation to $500 for manufacturer and warranty repairs when the cost of shipping vehicles to and from neighbor islands to Oahu is significantly more than $500 and when other dealers within Envy's market are not faced with similar expenses and not subject to the same limitation;

(d)     Volvo has discriminated against Envy by providing all dealers in

18

Envy's regional market with roughly $120,000 in "Wheel Bonus" incentive monies (approximately $500 per car) while refusing to offer the same promotional bonus incentive to Envy;

(e)     Volvo has discriminated against Envy by requiring Envy to spend significantly more money than other dealers to attend required Volvo training sessions and conferences within the contiguous United States, as a condition precedent to receiving any Volvo marketing or service incentives;

(f)     Volvo has discriminated against Envy by forcing Envy to use and pay for a Dealer.com website service that is over three times more expensive than comparable services, while allowing at least one other dealer in Envy's regional market to utilize less expensive and more functional and customizable website services, while refusing to afford Envy similar rights to market Volvo's products;

(g)     Volvo unfairly requires Envy to provide Volvo agents and employees with transportation accommodations for pretextual "business trips" to Hawaii resulting in significantly higher transportation expenses to Envy than to other dealers within Envy's market;

(h)     Volvo unfairly denied Envy the marketing benefits of the KMA showroom location on the basis of poor production and financial status (which was a direct result of Volvo's Punching Scheme), while allowing other dealers in Envy's market similar showroom marketing allowances and services.

(i)     Envy has the highest gross profit per vehicle in the nation—exceeding the average by over $2,100—yet Volvo managers continue to push Envy to increase sales and accuse Envy of performing poorly in relation to other dealers.

(j)     Volvo's top executives have threatened Envy with non-exclusivity in the state of Hawaii—overtly at company conventions and through proposed revisions to the Franchise Agreement that explicitly relegate Envy's franchise rights to non-exclusive status.

(k)     Volvo has imposed on Envy the responsibility of providing state-wide warranty service where Envy absorbs the majority of shipping costs for vehicles located on other islands yet refuses to grant Envy exclusive geographic rights.  Volvo does not appear to impose this type of requirement on any other dealer in the nation, and the resulting shipping costs incurred by Envy approaches $100,000.

(l)     Unlike dealers on the continental U.S., the average time for cars to reach Envy from the time vehicles are released from port and placed onto Envy's flooring line is three weeks, causing over $100,000 in excess interest charges being forced on Envy for vehicles not even in its possession.

(m)     Contrary to Section 29(B) of the Franchise Agreement, Michael Cottone, VP Western Region, and Brad Moorhead, Network Strategy Manager, conducted a surprise site visit/audit on November 9, 2016—instead of providing

20

reasonable advance notice, Volvo's market manager set up a Skype meeting under false pretenses, while in the meantime two of Volvo's top officers flew across the Pacific Ocean to surprise Envy's owner and vice president and "discuss" Envy's "performance."

(n)     As a condition precedent to receiving any dealer incentives, Volvo requires Envy to spend at least $20,000 annually to attend training sessions and conferences, yet does not account for the increased financial burden imposed on Envy relative to other dealers located in the continental U.S.—no other dealers are required to fly over 2,500 miles one-way or to spend thousands of dollars to attend these training sessions and conferences.

(o)     Volvo has frequently charged Envy for unnecessary merchandise without Envy's prior approval and, occasionally, without even delivering the merchandise.

(p)     Volvo has failed to deliver approximately $200,000 in incentive payments owed to Envy—the actual amount may be much larger, but is currently unknown due to the convoluted nature of Volvo's incentive programs and internal metrics.

(q)     Volvo applies a uniform facilities improvement program (V.R.E.), demanding of dealers certain facility upgrades, yet refuses to account for Hawaii's unique and expensive construction and real estate markets.

92.     All of the foregoing actions by Volvo occurred over an extended period of time from at least 2013 through to the present, have prevented Envy from being competitive with other dealers in its regional marketplace, and have caused actual harm and damages to Envy.

93.     All of the foregoing actions created a price difference between vehicles sold to Envy through the incentives and subsidies offered to it versus to other dealers within Envy's marketplace.

94.     Volvo has in bad faith abused its discretionary powers under its agreement with Envy to financially starve Envy in retaliation for refusing to participate in the Punching Scheme.

95.     Envy has not, and cannot, operate financially without accepting incentives from Defendant as the vast majority of dealer revenue from new car sales derive from proceeds of Volvo's dealer incentives.

96.     On or about November 10, 2016, Envy delivered a formal notice to Volvo that it was rejecting Volvo's coercive punching practices and requesting a response.

97.     In December of 2016, Volvo requested additional time to provide a response to Envy's allegations.

98.     On December 23, 2016, in retaliation for Envy's refusal to further engage in the fraudulent punching practice, Volvo filed a lawsuit against Envy in the

United State District Court, Central District of California, Southern Division (Case. No. 16-cv-2250) ("CA Suit") in an apparent attempt to constructively terminate and/or rescind the 2016 ARA.

99.   On or about December 29, 2016, Envy received notice that Volvo had failed to supply the required documentation to the State of Hawaii's Motor Vehicle Industry Licensing Board, resulting in the immediate suspension of the sale and registration of Volvo's new vehicles in the state of Hawaii.

100.   From December 29, 2016 to January 20, 2017, Envy sustained significant financial and reputational loss as a result of Volvo's failure to renew its license with the state of Hawaii.

101.   In March of 2017, Volvo implemented a new allocation policy requiring dealers to either accept or reject the entirety of each shipment of vehicles from Volvo, as opposed to the previous practice of accepting or rejecting individual vehicles, resulting in significant additional cost and expense to Envy.

102.   As a direct and proximate result of Volvo's Punching Scheme, bad faith, fraudulent conduct, intentional misrepresentations, and coercive business practices as indicated in the preceding paragraphs, Envy has sustained injury to its business and property in the form of, *inter alia*, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles, lost customer goodwill, lost employees, lost

market value, lost marketing monies, lost potential future sales of vehicles to repeat customers, lost monies from extended warranty related items, and lost personal expenses and reputational damage.

103.   From approximately January 2017 until present, after Envy had already been sued by Volvo in the CA Suit, Envy has suffered arbitrary price increases in Volvo vehicles and parts, at Volvo's discretion. Upon information and belief, other dealers within Envy's market have not faced the same pricing changes.

104.   At all times relevant to this action, Envy and Volvo were, and are, persons engaged in interstate commerce and the vehicles sold to Envy by Volvo crossed state lines.

## COUNT I
### (Violations of 15 U.S.C.A. § 1221 et seq.)

105.   Envy repeats and realleges paragraphs 1 through 104 above as though fully set forth herein.

106.   Under 15 U.S.C.A. § 1221(a) and (c), Defendant is an "automobile manufacturer" and Plaintiff is an "automobile dealer."

107.   Under 15 U.S.C.A. § 1221(b), the Franchise Agreement between the parties is a "franchise."

108.   15 U.S.C.A. § 1221(e) defines "good faith" as the duty of parties to a

24

franchise to "act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party."

109.   Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy and in clear disregard of Defendant's duty to act in "good faith."

110.   15 U.S.C.A. § 1222 provides, "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer[.]"

111.   Defendant is an "automobile manufacture" engaged in commerce in the U.S. District for the State of Hawaii and Plaintiff is "automobile dealer" that has been damaged in the U.S. District for the State of Hawaii by Defendant's various breaches of good faith regarding the Franchise Agreement.

## COUNT II
**(Violation of Robinson-Patman Act, 15 U.S.C.A. § 13(a))**

112.   Envy repeats and realleges paragraphs 1 through 111 above as though fully set forth herein.

113.   At all relevant times herein, Plaintiff and Defendant were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C.A. § 13 of the Robinson-Patman Act in that the vehicles sold to Plaintiff and other market area dealers crossed state lines and Defendant is a motor vehicle distributor engaged in the sale of motor vehicles in interstate commerce.

114.   Volvo discriminated in price between Envy and other market area dealers who received incentives and subsidies that were not available to Envy. This price discrimination was for products of similar grade and quality.

115.   Through the elevated vehicle and parts cost, the higher Flooring Line requirement, the vehicle transportation reimbursement limitation, the Wheel Bonus program, the dealer.com website requirement, the required additional transportation costs, denial of the KMA showroom incentive, and other discriminatory dealer incentive programs, Defendant has caused injury and prevented competition to the advantage of other market-area dealers who received incentives and subsidies that were not available to Envy or were not available on proportionally equal terms.

116.   Envy competes with other Volvo dealers located in California, Arizona, Nevada, and throughout the United States, who pay lower prices and less

26

fees for Volvo motor vehicles as a result of the above-referenced discriminatory programs.

117.    The effect of Defendant's unlawful and intentional bad faith and discrimination has been substantially to lessen competition between and among Envy and the other Volvo dealers with which Envy competes.

118.    Defendant's institution of its various illegal and discriminatory programs has permitted competing Volvo dealers to lower their retail prices to reflect their lower acquisition cost, forcing Envy to lose sales, reduce their profit margins, or both.

119.    The discounts and incentives provided to competing Volvo dealers through these programs were and are not functionally available to Envy for the reasons fully set forth above, including Defendant's setting unreasonably high sales objectives for Envy in comparison to other Volvo dealers.

120.    The favored dealers who receive discounts and incentives under these programs are able to lower their retail prices to reflect their lower acquisition cost, forcing Envy to lose sales, reduce their profit margins, or both.

121.    The favored dealers who received discounts and incentives under these illegal and discriminatory programs provide no service or savings to Volvo which are not provided in identical kind by the Plaintiffs.  Each affected dealer maintains an inventory of purchased vehicles on dealership property and competes

to sell and service Volvo vehicles in accordance with the Dealer Agreements.

122.   Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

123.   As a direct and proximate result of Defendant's violations of the Robinson-Patman Act, Envy has been damaged.  These damages include but are not limited to: (i) lost sales to favored competitors and the profits associated with those sales; (ii) lost profit margin in an attempt to prevent the loss of such sales; and (iii) lost vehicle allocation which would be earned as a result of additional sales.

124.   Plaintiffs' injuries are the type that the Robinson-Patman Act was designed to prevent and flow from Defendant's unlawful conduct.

125.   As a direct and proximate result of the foregoing violations, Defendant has caused Envy substantial financial harm, in amounts to be proven at trial.

## <u>COUNT III</u>
### (Violations of HRS Chapter 437)

126.   Envy repeats and realleges the allegations in paragraphs 1 through 125 as though fully set forth herein.

127.   Under Hawaii Revised Statutes ("**HRS**") chapter 437, Volvo is a "manufacturer" and "distributor" and Envy is a "dealer." HRS § 437-1.1.

128.   The Hawaii legislature has recognized that the unequal bargaining power of franchisor manufacturers and franchisee dealers poses a threat the economy of Hawaii as well as the welfare of consumers and businesses within the state.

129.   HRS § 437-1 provides,

> **§ 437-1. Legislative findings and declaration**
> The legislature finds that:
> (1) The manufacture, distribution, and sales of motor vehicles in the State vitally affects the general economy of the State and the public interest and public welfare;
> (2) Manufacturers of motor vehicles without physical manufacturing facilities within the State and motor vehicle distributors doing business in the State through their control over, and relationships and transactions with their dealers, branches, and representatives; and
> (3) The geographical location of Hawaii makes it necessary to ensure that motor vehicles, parts and dependable service are available within the State to protect and preserve the transportation system and the investments of its residents.
> The legislature declares, on the basis of the foregoing findings, that it is necessary to regulate and to license motor vehicle manufacturers, distributors, dealers, salespersons, and auctions in the State *in order to prevent frauds, impositions, and other abuses against its residents and to protect and preserve the economy and the transportation system of the State*. In order to further this intent, the legislature finds that this chapter is remedial and shall apply to all franchise agreements existing as of the date of enactment, except to the extent that such application violates any provision of the state or federal constitutions.

Emphasis added.

130.   HRS § 437-41 provides, "All provisions in this chapter shall be liberally interpreted to protect the public from fraud in the business of purchasing or selling motor vehicles and to protect the investments of its citizens in motor vehicles and dealerships and to protect the transportation system of the State and shall further be interpreted to affect existing as well as future franchise agreements."

131.   HRS § 437-28.5 provides, in part,

> **Notwithstanding the terms, provisions, or conditions of any dealer or distributor agreement, franchise, or waiver** and notwithstanding any other legal or administrative remedies available, **any person who is licensed under this chapter and whose business or property is injured by a violation of section 437-28(a)(21) or part II may bring a civil action in a court of competent jurisdiction in the State to enjoin further violations and to recover any damages together with the costs of the suit.** Laws of the State of Hawaii shall apply to any action initiated under this subsection.

Emphasis added.

132.   HRS § 437-28(a)(21) imposes numerous obligations on manufacturers and distributors with respect to its dealings with its franchised dealers.

133.   Volvo has violated HRS § 437-28(a)(21), causing harm to Envy therefrom, in numerous respects, including but not limited to:

(a)     Requiring Envy to participate in the Punching Scheme, in part,

by implicitly and explicitly threatening to award a franchise to another person for the sale of the same make of motor vehicles in Envy's relevant market area, implementing and establishing unreasonable, arbitrary, and unfair sales and performance standards, implementing and establishing an unfair, inequitable, and unreasonably discriminatory system of motor vehicle allocation in violation of HRS § 437-28(a)(21)(B), HRS § 437-52(12), HRS § 437-52(13), and Section 15 of the Franchise Agreement.

(b)     Requiring Envy, a dealer within the State, to refrain from performing acts not contrary to the reasonable requirements of the franchise agreement by requiring Envy, through implied threats of franchise agreement non-renewal, in violation of HRS § 437-28(a)(21)(A).

(c)     Requiring Envy, a dealer within the State, to dispose of its profitable and independent used car dealership as a condition of manufacturer cooperation with retail space improvements and therefrom, which in turn, was a condition of renewal (no renewal if no facility upgrades), in violation of HRS § 437-28(a)(21)(J).

(d)     Imposing inequitable pricing policies upon Envy which results in higher prices of new motor vehicles to the consumers in the State, in violation of HRS § 437-28(a)(21)(E).

(e)     Imposing discriminatory incentive programs that directly and

31

indirectly charge Envy more for new motor vehicles, services, parts, and accessories than is charged to Defendant's competing franchises dealers in the relevant market, in violation of HRS § 437-28(a)(21)(E).

(f)    Requiring Envy, as a condition of sale and delivery of new motor vehicles, to purchase special features, appliances, accessories, or equipment not desired or requested by the Envy, in violation of HRS § 437-28(a)(21)(F).

(g)    Defendant, through the Punching Scheme and otherwise, has failed to adequately and fairly compensate Envy for labor incurred by Envy to perform under and comply with manufacturer's warranty agreements, in violation of HRS § 437-28(a)(21)(G).

134.    Defendant has violated HRS § 437-52, causing harm to Envy in numerous respects, including:

(a)    Seeking to cancel the 2016 ARA without proper notice and without good cause and good faith, in violation of HRS § 437-52(3).

(b)    Requiring Envy to construct, renovate, or make substantial alterations to its facilities, where such construction, renovation, or alteration requirements were not reasonable or justifiable based on reasonable business consideration, by forcing Envy to install service lifts where Envy did not have sufficient service techs to make use of those lifts, thereby violating HRS § 437-52(6).

(c)    Requiring Envy to purchase promotional materials not ordered

or agreed to by Envy and charging the cost of the materials to Envy's parts account, in violation of HRS § 437-52(10).

(d)    Implementing a customer satisfaction index or other system measuring a customer's degree of satisfaction with Envy as a sale or service provider where such system is not fair and equitable to both Volvo and Envy because the surveys used to measure customer satisfaction were sent only to new car customers and not purchasers of punched cars, resulting in low levels of feedback and negatively skewing the average score, making it impossible to meet satisfaction thresholds, thereby violating HRS § 437-52(11) and (12).

(e)    Implementing a system of motor vehicle allocation or distribution applicable to Envy that is unfair, inequitable, and unreasonably discriminatory because it requires Envy to accept new vehicles that are not ordered by the dealer, but are instead ordered by Volvo employees, and requiring Envy to accept or reject all vehicles in a shipment, regardless of whether Envy wanted or ordered any of the vehicles in the shipment, thereby violating HRS § 437-52(13).

135.    Defendant has violated HRS § 437-57, causing harm to Envy in numerous respects by (1) back charging Envy for sales incentive and warranty payments without any or sufficient proof that Envy's claim was fraudulent or that the Envy did not substantially comply with the reasonable written procedures of Volvo; and (2) failing to provide any written notice that the chargeback was

33

forthcoming, thereby violating HRS § 437-57(b) and (c).

136.    Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

137.    As a direct and proximate result of the foregoing violations, Defendant has placed Envy at a distinct and significant economic disadvantage with other Volvo franchised dealers in the relevant market such that Envy cannot effectively compete against other dealers in the market area.

138.    As a direct and proximate result of the foregoing violations, Defendant has caused Envy substantial financial harm, in amounts to be proven at trial.

## <u>COUNT IV</u>
### (Wrongful Franchise Termination)

139.    Envy repeats and realleges paragraphs 1 through 138 above as though fully set forth herein.

140.    HRS § 437-58 prohibits manufacturers and distributors like Defendant from terminating franchise agreements without prior notice and requires "written notice to the dealer and the board of the manufacturer's intent to terminate, discontinue, cancel, or fail to renew a franchise agreement at least sixty days before the effective date thereof, and state with specificity the grounds being relied upon for such discontinuation, cancellation, termination, or failure to renew."

141.    No such notice was provided to Envy.

142.   Defendant has constructively terminated, anticipatorily repudiated, and/or anticipatorily breached the Franchise Agreement, without right, in two respects: (a) initiating the CA Suit to rescind the Franchise Agreement, and (b) refusing to afford Envy the benefit of the Franchise Agreement rendering Envy financially unable to operate its business.

143.   In fact, Defendant even failed (intentional or otherwise) to renew its own license to distribute vehicles within the State.

144.   By letter dated December 29, 2016, the Motor Vehicle Industry Licensing Board provided notice to Envy that Defendant was delinquent in its obligation to renew its license to distribute new motor vehicles to consumers in the state of Hawaii.

145.   Said letter provides, "Volvo Car USA LLC is not authorized to distribute motor vehicles in this state."

146.   Despite the potential adverse impacts on Envy's business, Volvo gave Envy no notice of the non-renewal; the foregoing letter was the first notice to Envy that Volvo's manufacturer/distributor license was even a subject of agency action.

147.   Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

148.   Under HRS § 437-58, Envy is entitled to compensation for wrongful and bad faith termination of the Franchise Agreement.

149.   As a direct and proximate result of the foregoing violations, Defendant has caused Envy substantial financial harm, in amounts to be proven at trial.

## COUNT V
**(Breach of Franchise Agreement and
Implied Covenant of Good Faith and Fair Dealing)**

150.   Envy repeats and realleges paragraphs 1 through 149 above as though fully set forth herein.

151.   Under the Franchise Agreement, the parties agreed to maximize the potential of Volvo products together, grow the brand, and together build a mutually strong financial relationship.

152.   Under the Franchise Agreement, Defendant had a duty to treat Envy in good faith and fairly, openly, and honestly.

153.   Under Hawaii law, parties must exercise contractually afforded discretion in good faith and consistent with the objectively reasonable expectations of the parties.

154.   Because Defendant is the sole source of Volvo products to its dealers, and with its dealers investing substantial capital in their facilities, personnel, and fixed assets, there exists a dramatic economic imbalance in the relationship between Volvo and its dealers.

155.   Defendant has leveraged this economic imbalance and breached its express and implied duties through its pattern of economic coercion and disparate

36

treatment of Envy through Volvo's contractually afforded discretion.

156.   Through the Punching Scheme, Defendant in bad faith deprived Envy of the benefits associated with being a franchisee under the Franchise Agreement.

157.   Defendant has required Envy, in bad faith and without good reason (except only to mislead Defendant's investors at substantial gain to Defendant), to either participate in the fraud of the Punching Scheme or risk becoming financial non-competitive.

158.   Defendant breached the Franchise Agreement by wrongfully and in bad faith withholding its consent for Envy to proceed with the development of a new facility at KMA after inducing Envy to expend substantial sums for the proposed acquisition, development and improvement of facilities and infrastructure for the sale of Defendant's Vehicles.

159.   Defendant, through each and all of the facts described heretofore, has acted with bad faith indifference and inconsistent with the objectively reasonable expectations of the parties.

160.   Defendant's breaches have deprived Envy of new vehicle sales and the profits generated by other areas of the dealership associated with the sale of new vehicles, including but not limited to finance and insurance, trade-in vehicle sale and service, and legacy purchases through the customer.

161.   Defendant's breaches have deprived Envy of the benefit of the

Franchise Agreement.

162.   Defendant's breaches have damaged Envy's goodwill and reputation in the community.

163.   Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

164.   Defendant's breaches of the covenants of good faith and fair dealing proximately caused Envy's actual damages, plus additional special and consequential damages, in an amount to be proven at trial.

## COUNT VI
### (Unjust Enrichment)

165.   Envy repeats and realleges paragraphs 1 through 164 above as though fully set forth herein.

166.   Defendant benefited by receiving payments from Envy, without providing Envy with the benefits of the Franchise Agreement.

167.   Defendant benefited by receiving the brand goodwill generated by Envy, without providing Envy with the benefits of the Franchise Agreement.

168.   Defendant has been unjustly enriched because it received payments and services from Envy without providing Envy with the financial incentives owed to Envy as a result of the same.

169.   Defendant's above-described actions were intentional, malicious,

willful and in complete disregard and reckless indifference to the rights of Envy.

170.   It would be unjust and inequitable to allow Defendant to retain the amounts paid by Envy without providing reasonably equivalent value.

171.   Defendant will be unjustly enriched to the detriment of Envy if Defendant is not required to reimburse, refund or repay Envy for incentives owed and in other amounts to be proven at trial.

<u>**COUNT VII**</u>
**(Intentional Interference with Contractual Relationships)**

172.   Envy repeats and realleges paragraphs 1 through 171 above as though fully set forth herein.

173.   The Franchise Agreement requires Envy to maintain certain amounts of inventory financing.

174.   To satisfy this requirement, Envy entered into contractual relationships with at least three lenders.

175.   Defendant's fraudulent Punching Scheme caused Envy to breach its agreements with said lenders because it inflated Envy's inventory beyond the limits allowed under applicable agreements.

176.   Defendant's Punching Scheme intentionally and improperly interfered with Envy's performance of its lender agreements.

177.   Defendant's above-described actions were intentional, malicious,

willful and in complete disregard and reckless indifference to the rights of Envy.

178.   Defendant's interference with Envy's contractual agreements have damaged Envy's reputation in the community and ability to obtain financing on commercially feasible terms.

179.   As a result of Defendant's interference, Envy has suffered pecuniary and reputation damages in amounts to be proven at trial.

## COUNT VIII
### (Unfair and Deceptive Trade Practices Under Hawaii Revised Statutes § 482E)

180.   Envy repeats and realleges paragraphs 1 through 179 above as though fully set forth herein.

181.   Under HRS § 482E-2, Defendant is a "Franchisor" and Envy is a "Franchisee."

182.   HRS § 482E-6 requires franchisors and franchisees to deal with each other in good faith and makes the failure to do so an unfair and deceptive act.

183.   HRS § 482E-6 provides, in part, that it is an unfair and deceptive act for a Franchisor to "[d]iscriminate between franchisees in the charges offered or made for royalties, goods, services, equipment, rentals, advertising services, or in any other business dealing[,]" "[i]mpose on a franchisee by contract, rule, or regulation, whether written or oral, any unreasonable and arbitrary standard of

conduct[,]" and "terminate or refuse to renew a franchise except for good cause[.]"

184.   Primarily through its Punching Scheme, but also in all other respects above described, Defendant has discriminated between Envy and other franchisees in the charges offered or made for royalties, goods, services, equipment, rentals, advertising services, or in any other business dealing.

185.   Primarily through its Punching Scheme, but also in all other respects above described, Defendant has imposed on Envy unreasonable and arbitrary standards of conduct.

186.   Primarily through the CA Suit, but also in other respects above described, Defendant has constructively terminated, anticipatorily repudiated, and/or anticipatorily breached the Franchise Agreement without good cause.

187.   Defendant's above-described actions were intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

188.   Envy has suffered and continues to suffer substantial injury due to Defendant's conduct as described above.

189.   "The commission of any unfair or deceptive acts or practices or unfair methods of competition prohibited by section 482E-6 shall constitute an unfair or deceptive act or practice under chapter 480." HRS § 482E-9.

190.   As a result of the foregoing, Envy is entitled to all relief afforded under chapter 480, including the imposition of treble and punitive damages, and recovery

of attorney's fees, in amounts to be proven at trial.

WHEREFORE, Envy prays that judgment be entered in favor of Envy and against Defendant as follows:

1.     That Envy recover from Defendant amounts to be proven at trial for the actual, expectation, special and consequential damages which Envy sustained, including all compensatory amounts owed under HRS chapter 437.

2.     That Envy be awarded punitive damages based on Defendant's conduct which was intentional, malicious, willful and in complete disregard and reckless indifference to the rights of Envy.

3.     That Envy be awarded treble damages pursuant to HRS chapter 480.

4.     With respect to all counts, that Envy recover from Defendant its attorneys' fees and costs.

5.     Such other and further relief as this court deems just and proper.

DATED:  Honolulu, Hawaii, April 17, 2017.

          /s/ Lyle S. Hosoda
LYLE S. HOSODA
ADDISON D. BONNER
KEVIN W. HERRING
JAE PARK
BENJAMIN M. CREPS

Attorneys for Plaintiff
ENVY HAWAII LLC