GOODSILL ANDERSON QUINN & STIFEL
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOHNATHAN C. BOLTON     9650-0
    jbolton@goodsill.com
DYLAN J. TASCHNER          10618-0
    dtaschner@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawai'i 96813
Telephone: (808) 547-5600
Facsimile:  (808) 547-5880

Attorneys for Plaintiff
NEXTGEAR CAPITAL, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NEXTGEAR CAPITAL, INC.,<br><br>                    Plaintiff,<br>    vs.<br><br>ENVY HAWAII LLC d/b/a WINDWARD MOTORS d/b/a V RENT A CAR d/b/a VOLVO OF HONOLULU and MIKHAIL BORISOVICH FEDOTOV,<br><br>                    Defendants. | Civil No. 1:18-cv-00415-DKW-KSC<br><br>MEMORANDUM IN SUPPORT OF MOTION |

# TABLE OF CONTENTS

**PAGE**

**BACKGROUND FACTS** ........................................................................1

A. Floor Plan Lending............................................................................1

B. Sales Out Of Trust............................................................................2

C. Plaintiff's Loans To Envy .................................................................2

D. Envy's Defaults under the Note ........................................................6

E. Attempts at a Work Out.....................................................................7

F. The Litigation Between Envy and Volvo ..........................................9

G. NextGear's Repossession of the Vehicles ......................................11

**LAW AND ARGUMENT**..................................................................11

A.  This Court Has the Authority to Appoint A Receiver .....................11

   1. FRCP 66 Provides a Statutory Basis for the Appointment of a
     Receiver in the Instant Action  .......................................................11

   2.  Plaintiff Has A Contractual Right To Appointment Of A Receiver............13

   3.  This Court Has Inherent Equitable Power To Fashion Relief.....................13

B.  A Receiver Should Be Appointed to Protect and Preserve
    Plaintiff's Collateral And Its Proceeds ...........................................15

1.  Plaintiff Has a Valid Claim.............................................................16

2.  There is Evidence of Fraudulent Conduct by Envy .........................16

3.  Plaintiff's Collateral is in imminent danger
    of being lost concealed, or diminished in value ..............................17

4.  Legal remedies are inadequate ........................................................18

5.  The harm to Plaintiff Outweighs Injury to Envy ...........................19

6.  Plaintiff's Probable Success in the Action......................................19

7.  Plaintiff's Interests to be Protected Will Be Well-Served by Receivership.......20

C.  Appointment of a Receiver is Appropriate in this Case ..................21

D.  Nomination of Receiver ..................................................................22

**CONCLUSION** ................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,
  999 F.2d 314 (8th Cir. 1993) .................................................................15

Canada Life Assur. Co. v. LaPeter,
  563 F.3d 837 (9th Cir. 2009) ...............................................14, 15, 16

Consol. Rail Corp. v. Fore River Ry. Co.
  861 F.2d 322 (1st Cir. 1988)...............................................................15

Crowley v. Valley West Water Co.,
  882 P.2d 1022 (Mont. 1994)................................................................20

First American Bank Valley v. George J. Hegstrom Co., Inc.,
  551 N.W.2d 288 (1996) .......................................................................17

LBUBS 2007-C2 Alii Drive, LLC v. Anekona, LLC,
  No. CIV 09-00114 SOM-BMK, 2010 WL 99362, at *1
  (D. Haw. Jan. 12, 2010)......................................................................21

Levin v. Garfinkle,
  514 F. Supp. 1160 (E.D. Pa. 1981).....................................................16

New York Life Ins. Co. v. Watt West Inv. Corp.,
  755 F. Supp. 287 (E.D. Cal. 1991) .....................................................16

Office Depot Inc. v. Zuccarini,
  596 F.3d 696 (9th Cir. 2010) ..............................................................21

PNC Bank, N.A. v. Presbyterian Ret. Corp.,
  No. CIV.A. 14-0461-WS-C, 2014 WL 6065778
  (S.D. Ala. Nov. 13, 2014)....................................................................12

Ratcliff v. Ratcliff,
  39 N.E.2d 435 (Ind. 1942) ..................................................................20

S.E.C. v. Billion Coupons, Inc.,
  No. CIV. 09-00068 JMS-LEK, 2009 WL 2143534, at *4
  (D. Haw. July 13, 2009);......................................................................14

S.E.C. v. Hardy,
    803 F.2d 1034 (9th Cir. 1986) ...............................................................14

Skanning v. Sorensen, No. CIV. 09-00364 DAE-KSC,
    2009 WL 5449149, at *4 (D. Haw. Dec. 10, 2009),
    modified sub nom. Skaaning v. Sorensen,
    679 F. Supp. 2d 1220 (D. Haw. 2010)...................................................14

Sterling Sav. Bank v. Citadel Development Co., Inc.,
    656 F. Supp. 2d 1248 (2009) .................................................................13

U.S. Bank Nat. Assoc. v. CB Settle Inn Ltd. Partnership,
    827 F. Supp. 2d 993 (2011) ...................................................................13

U.S. Bank Nat. Assoc. v. Nesbitt Bellevue Property, LLC,
    866 F. Supp. 2d 247 (S.D.N.Y. 2012) ...........................................13, 21

View Crest Garden Apartments, Inc. v. U.S.,
    281 F.2d 844 (9th Cir. 1960) .................................................................13

Wells Fargo Bank, N.A. v. CCC Atl., LLC,
    905 F.Supp.2d 604 (D.N.J. 2012).........................................................13

**OTHER AUTHORITIES**

12 Wright & Miller, FED. PRAC. & PROC. CIV., Appointment of Receivers
    § 2983 (2d ed. 2015) ..............................................................................21

## MEMORANDUM IN SUPPORT OF MOTION

Plaintiff NEXTGEAR CAPITAL, INC. ("Plaintiff" or "NextGear"), by and through its counsel, Goodsill Anderson Quinn & Stifel, a Limited Liability Law Partnership LLP, respectfully submits this Motion for Appointment of Receiver and respectfully states as follows:

## BACKGROUND FACTS

**A.    Floor Plan Lending**

Floor plan lending is a form of inventory financing for a dealer of automobiles, in which each loan advance is made against a specific piece of collateral.  The primary source of repayment for a floor plan loan is the proceeds from the sale of the inventory.  Automobiles are typically sold by a dealer under a direct or indirect retail installment agreement or for cash.

As the dealer sells each piece of collateral, the loan advance against each specific piece of collateral is required to be repaid to the floor-plan lender within a short amount of time, in this case, within twenty-four hours of receipt of the proceeds.  As security for repayment of the loans, the floor plan lender holds the title to each vehicle and releases the titles to the dealer only after they have received payment for that vehicle.[1]

---

[1] Although floor plan advances are typically repaid as the inventory is sold, curtailment provisions require periodic principal reductions by the dealer for "stale" inventory.  Curtailment provisions establish the required timing and percentage reduction in principal for each loan when the financed inventory does not sell within a specified period of time.

An automobile dealership operates much like a cash-based business, and the essence of the dealership business model is to turn over inventory for cash proceeds in a relatively short time.  Automobile dealers, like Envy, are usually highly-leveraged because of the need to maintain large amounts of inventory.

In a normal market, a successful automobile dealer can liquidate its financed inventory relatively quickly before the inventory loses a significant amount of its original value.  However, in a depressed market, dealers are unable to sell their inventory within the period required by their agreements with their floor plan lender and must pay the lender additional fees for "stale" inventory.

**B.     Sales Out of Trust**

Occasionally, automobile dealers sell floorplanned vehicles to consumers by execution of a retail installment contract, receive a payment from a finance company for the sale and assignment of the contract, and then fail to use these proceeds to pay their floor plan lender as required under the terms of the subject loan documents.  This is referred to as a "sale out of trust."

In this case, Plaintiff became aware that Envy engaged in a pattern or practice of engaging in "sales out of trust" amounting to millions of dollars in losses.

**C.     Plaintiff's Loans to Envy**

On or about September 4, 2015, NextGear and Envy entered into a *Demand*

-2-

*Promissory Note and Loan and Security Agreement* (the "Note") with Defendant ENVY HAWAII LLC ("Envy"), which evidenced Plaintiff's loan to Envy in the original principal amount of $500,000.00 (FIVE HUNDRED THOUSAND DOLLARS), secured by a lien and security interest in substantially all of the assets of Envy.  A true and correct copy of the Note is attached hereto as **Exhibit "A"** and is incorporated herein by reference for all purposes.[2]

On or about September 4, 2015, Plaintiff and Envy entered into a *Power of Attorney (Entity/Partnership)* (the "Power of Attorney") in which, among other things, Envy gave NextGear full power and authority to take the following actions upon the occurrence of an Event of Default:

(a)   demand, collect, accept receipt for, **settle, compromise, adjust, foreclose, or realize upon any of the Collateral**, in each case in such manner as Lender may determine;

(b)   **file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction** or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender **for the purpose of collecting any and all such moneys due to Borrower**, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c)   file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

---

[2] The Advance Schedule, made a part of the Note, required that Envy make principal reduction payments in the amount of 1.25% every 30 days for 36 months in order to extend the Maturity Date (as defined therein).

(d)     notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

Power of Attorney at pp. 1-2 (emphasis added).  A true and correct copy of the Power of Attorney is attached hereto as **Exhibit "B"** and is incorporated herein by reference for all purposes.

On or about September 4, 2015, Defendant MIKHAIL BORISOVICH FEDOTOV ("Fedotov" or "Guarantor") signed an *Individual Guaranty* (the "Guaranty") wherein he "voluntarily, unconditionally, and absolutely guarantee[d] (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities . . .."[3]  A true and correct copy of the Guaranty is attached hereto as **Exhibit "C"** and is incorporated herein by reference for all purposes.

On or about September 30, 2015, Plaintiff filed a UCC-1 Financing Statement (the "UCC-1") with the Bureau of Conveyances of the State of Hawai'i under File No. A-57510810 to perfect its security interest and liens in the

---

[3] The Note defines the term "Liabilities" to mean "any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired."

-4-

Collateral (as that term is defined in the Note).  A true and correct copy of the UCC-1 is attached hereto as **Exhibit "D"** and is incorporated herein by reference for all purposes.[4]

On or about March 16, 2016, Plaintiff and Envy entered into an *Amendment to Demand Promissory Note and Loan and Security Agreement* (the "Amendment"), which increased Envy Hawaii's Credit Line under the Note to $9,500,000 (NINE MILLION, FIVE HUNDRED THOUSAND DOLLARS).  A true and correct copy of the Amendment is attached hereto as **Exhibit "E"** and is incorporated herein by reference for all purposes.

On or about March 16, 2016, Plaintiff and Envy entered into an Advance Schedule (the "Advance Schedule Amendment"), which, among other things, increased the required principal reduction to extend the Maturity Date to 2.50% for specified periods of days.  A true and correct copy of the Advance Schedule Amendment is attached hereto as **Exhibit "F"** and is incorporated herein by reference for all purposes.

Envy's automobile dealership operated in three different segments, each of which are covered by the terms of Plaintiff's Note:

(e)   New Inventory.  With respect to new inventory, Envy purchased the new inventory from the manufacturer, Volvo, with funds borrowed

---

[4] The Note, the Power of Attorney, the Guaranty, the Amendment, the Advance Schedule Amendment and the UCC-1, together will all other documents evidencing the indebtedness, shall collectively be referred to herein as the "Loan Documents."

from Plaintiff, which holds a purchase money security interest ("<u>PMSI</u>") in the new vehicles. Plaintiff also holds title to each of the new vehicles and released the titles to Envy only as each vehicle was sold and Plaintiff was repaid. The current amount outstanding to Plaintiff for new inventory loans to Envy is approximately $516,379.30 plus accrued and accruing interest.

(f)     <u>Pre-Owned Inventory</u>. For pre-owned inventory, the manufacturer is absent from the floor plan lending arrangement. Envy purchased or retained used automobiles, including trade-ins from its customers, with funds loaned by Plaintiff. Plaintiff holds a lien and security interest on all of Envy's inventory to secure repayment of its loans for these used vehicles. The current amount outstanding to Plaintiff for pre-owned inventory loans to Envy is approximately $2,539,172.98 plus accrued and accruing interest.

(g)     <u>Rental Vehicles</u>. Envy also rents vehicles to customers under long-term or short-term rental agreements. Plaintiff holds a blanket lien and security interest on all of Envy's rental inventory to secure repayment of its loans for Envy's use of these vehicles. The current amount outstanding to Plaintiff for loans used to purchase rental vehicles is approximately $837,841.78 plus accrued and accruing interest.

## D.     Envy's Defaults under the Note

In early 2017, Plaintiff learned that Envy was in severe financial distress. Envy advised NextGear that it had sold approximately One Millon Dollars ($1,000,000) of vehicle inventory "out of trust," meaning Envy sold cars financed by NextGear, received the proceeds from the sales of those cars, but failed to hold the proceeds in trust or deliver them to NextGear, as contractually required by the Note. Envy further advised NextGear that it did not have the financial ability to pay off new cars within 365 days that had not yet sold, as required by the Note.

NextGear later discovered that Envy had been providing NextGear with

-6-

fraudulent rental agreements to conceal inventory that had been sold out of trust.

On or about May 17, 2017, Plaintiff declared Envy to be in default under the Note due to its payment defaults.

### E.   Attempts at a Work-Out

In June 2017, NextGear and Envy decided to work towards an amicable commercial divorce and entered into a Compromise Agreement, a copy of which is attached hereto as **Exhibit "G."**  Pursuant to the Compromise Agreement, Envy, *inter alia,* acknowledged the indebtedness to NextGear and underlying defaults, waived any equitable defenses to claims by NextGear, and provided NextGear a release from all claims.  In exchange, NextGear agreed to forbear from exercising its default remedies such as repossessing inventory, until August 1, 2017, so Envy could obtain a substitute lender or sell the business.

Envy located a buyer for the business and began a sales process.  However, the potential buyer backed out in early September 2017.  This prompted Envy's counsel to send a letter to NextGear and Volvo stating that, due to the buyer backing out of the sale, Envy had no option but to cease operations at the dealership effective September 15, 2017.  Volvo responded to that letter by accepting Envy's "voluntary termination" of the Franchise Agreement (defined below).  A few days later, NextGear and Volvo further determined that Envy was not paying its landlord, it was indebted to its landlord in an amount exceeding

$700,000, the landlord filed suit, and that Envy executed an Agreed Judgment for eviction.

Immediately thereafter, on or around September 18, 2017, NextGear reached an informal understanding with Volvo and Envy that would permit Envy to continue operations at the dealership for a short period while Envy actively marketed the dealership.  Specifically: (a) NextGear provided additional floorplan advances to Envy so it could pay its landlord a sufficient sum to remain in the premises through December 31, 2017, pursuant to a written letter agreement with the landlord; (b) Volvo agreed to *not* consider the Franchise Agreement as being terminated and to assist with locating a purchaser and expediting Volvo's approval of any prospective new franchisee; and (c) Envy agreed to continue operating the service center so that Volvo customers could get warranty work completed at the dealership by a licensed Volvo mechanic.

Although Envy worked towards finding a buyer, its efforts were unsuccessful.  In mid-November 2017, Volvo reached out to NextGear and requested a three-party mediation.  However, while the parties were working together to agree upon a location of mediation and the best mediator for these issues, Volvo, unilaterally and without notice, terminated Envy's rights under its Franchise Agreement.

Despite the termination, the mediation took place on December 19, 2017,

but was unsuccessful.

Following the failure of the mediation, Envy's failure to locate a buyer for the business, and Envy's continued failure to comply with the terms of the Note, NextGear declared an event of default under the Note and repossessed and liquidated the majority of the vehicles upon which it holds a lien pursuant to the Loan Documents.

Plaintiff has declared the entire Indebtedness due and owing under the Note, which indebtedness, including principal, interest, finance charges and other fees as of October 23, 2018, is no less than $3,977,273.50 (the "Indebtedness").  Despite demand for payment by NextGear, the Indebtedness has not been fully satisfied.

**F.    The Litigation Between Envy and Volvo**

On or about January 27, 2017, Envy initiated a lawsuit against Volvo in the United District Court of the District of Hawai'i, under Civil No. 17-cv-00040 (the "Federal Lawsuit"), alleging that Volvo wrongfully breached the Authorized Retailer Agreement between Envy and Volvo entered into on or about July 8, 2016 (the "Franchise Agreement").  A true and correct copy of the First Amended Complaint filed in the Federal Lawsuit is attached hereto as **Exhibit "H"** and is incorporated herein by reference for all purposes.

On or about April 6, 2018, Volvo filed a Motion for Leave to file a Second Amended and Supplemental Counterclaim against Envy and Fedotov, which was

granted on May 25, 2018 (the "Volvo Motion to Supplement Counterclaim").  A true and correct copy of the Motion for Leave to file a Second Amended and Supplemental Counterclaim is attached hereto as **Exhibit "I"** and is incorporated herein by reference for all purposes.

On or about January 12, 2018, Envy also initiated a lawsuit against Volvo in the Circuit Court of the First Circuit, State of Hawai'i, Civil No. 18-1-0000-67 (the "State Court Lawsuit" together with the Federal Lawsuit, the "Lawsuits"), alleging Volvo's breach of the Franchise Agreement.  A true and correct copy of the Complaint filed in the State Court Lawsuit is attached hereto as **Exhibit "J"** and is incorporated herein by reference for all purposes.

Envy's Lawsuits against Volvo are a corporate asset, and the proceeds of any settlement or judgment obtained against Volvo in those cases should to be paid to NextGear, as the senior secured creditor before any distributions are made to any other creditors or shareholders of Envy.  Because there is no possibility that Volvo would *ever* pay Envy a settlement large enough to pay off all creditors and result in a dividend to shareholders, the suit is being prosecuted—practically and legally—for the benefit of Envy's creditors—the largest of which is NextGear.  It is unclear whether Envy understands this proposition, although NextGear has conveyed it multiple times.

**G.      NextGear's Repossession of the Vehicles**

Following Envy's default, NextGear took actions to repossess the majority of the vehicles upon which it holds a lien pursuant to the Loan Documents and, as described above, has liquidated the majority of those vehicles.

NextGear is also currently estimating the likely payment it will receive for the remainder of the inventory, supplies, equipment and furnishings Envy purchased from Volvo or a Volvo-designated supplier and the likely deficiency balance that will result.

The institution of a receivership for Envy will allow an independent fiduciary to (i) complete the orderly liquidation of Envy's assets, (ii) take control of and review Envy's books and records, (iii) take control of the Volvo lawsuits from Envy and prosecute or settle that litigation with the interests of Envy's creditors, including NextGear, in mind, and (iv) distribute the proceeds of NextGear's collateral to NextGear.

**LAW AND ARGUMENT**

**A.      This Court has the Authority to Appoint a Receiver**

> **1.      FRCP 66 provides a statutory basis for the Appointment of a Receiver in the instant action.**

FRCP 66 governs receiverships in federal court, and provides:

> These rules govern an action in which **the appointment of a receiver is sought** or a receiver sues or is sued.  But the practice in administering an estate by a receiver or a

-11-

> similar court-appointed officer must accord with the
> historical practice in federal courts or with a local rule.
> An action in which a receiver has been appointed may be
> dismissed only by court order.

FED. R. CIV. P. 66 (emphasis added).  Local Rule 66.1 of the District of Hawai'i,

which governs receivers, provides inventorying requirements, necessary reports,

receiver compensation, and instructions for estate administration for receivers.  See

id. at (a)-(d).[5]  Additionally, a review of the "historical practice in federal courts"

shows that appointment of a Receiver under these circumstances is appropriate.  In

deciphering the meaning of "historical practice in federal courts[,]" courts have

essentially construed it to mean federal case law.  See PNC Bank, N.A. v.

Presbyterian Ret. Corp., No. CIV.A. 14-0461-WS-C, 2014 WL 6065778, at *3

(S.D. Ala. Nov. 13, 2014) ("A substantial body of federal case authorities is

helpful in fleshing out the 'historical practice'. . . .").  Looking to federal

precedent, it is well established that a Receiver is appropriate in this case.

---

[5] Local Rule 66.1 provides that:

> [i]n the exercise of the authority vested in the district
> courts by Fed. Civ. P. 66, this rule is promulgated for
> the administration of estates by receivers or by other
> similar officers appointed by the court. Except in the
> administration of the estate, any civil action in which the
> appointment of a receiver or other similar officer is
> sought, or which is brought by or against such an officer,
> is governed by the Federal Rules of Civil Procedure and
> by these rules."

LR 66.1.

### 2.   Plaintiff Has a Contractual Right to Appointment of a Receiver.

Federal Courts have explained that "the existence of a provision authorizing the application for a receiver in the event of default, strongly supports the appointment of a receiver when there is a default." U.S. Bank Nat. Assoc. v. Nesbitt Bellevue Property, LLC, 866 F. Supp. 2d 247, 251 (S.D.N.Y. 2012); View Crest Garden Apartments, Inc. v. U.S., 281 F.2d 844, 845, 847-48 (9th Cir. 1960). "In cases where contracts have explicitly provided for appointment of receiver, courts are split as to whether the advance consent is dispositive or merely a factor to consider in the analysis." U.S. Bank Nat. Assoc. v. CB Settle Inn Ltd. Partnership, 827 F. Supp. 2d 993, 997-98 (2011) (citing cases). Courts holding that consent by the parties is not dispositive have nonetheless found consent by the parties to be "a factor that commands great weight." Sterling Sav. Bank v. Citadel Development Co., Inc., 656 F. Supp. 2d 1248, 1260 (2009).

Section 7(b) of the Note between Plaintiff and Envy specifically provides for the appointment of a receiver as one of Plaintiff's remedies upon default. Under such circumstances, appointment of a receiver is not a drastic remedy. See, .e.g., Wells Fargo Bank, N.A. v. CCC Atl., LLC, 905 F.Supp.2d 604, 615–16 (D.N.J. 2012). Appointment of a receiver is therefore appropriate in this case.

### 3.   This Court has inherent equitable power to fashion relief

It is well-established that federal courts have broad equitable powers, which

include the power to appoint a receiver.  The Ninth Circuit has "recognized the broad nature of a court's equitable powers in determining whether or not to appoint a receiver." Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 845 (9th Cir. 2009).

Both Hawai'i state and federal courts have reached similar conclusions.  See Hawaii Ventures, 114 Haw. at 456, 164 P.3d at 714 ("A receivership is equitable in nature and the court's extraordinary broad remedial powers and wide discretion to appoint receivers derive from its inherent powers of equity to fashion relief."); see also Skanning v. Sorensen, No. CIV. 09-00364 DAEKSC, 2009 WL 5449149, at *4 (D. Haw. Dec. 10, 2009) (recognizing that a "receivership is equitable in nature"), modified sub nom. Skaaning v. Sorensen, 679 F. Supp. 2d 1220 (D. Haw. 2010).  Moreover, "federal courts are free to provide that remedy [of receivership] solely by virtue of their equitable powers." Canada Life, 563 F.3d at 843 (emphasis added).

This Court has explained that the "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." S.E.C. v. Billion Coupons, Inc., No. CIV. 09-00068 JMSLEK, 2009 WL 2143534, at *4 (D. Haw. July 13, 2009); see also S.E.C. v. Hardy, 803 F.2d 1034, 1038 (9th Cir. 1986).  Accordingly, it is within this Court's equitable powers to appoint a receiver in the instant case.

-14-

**B.      A Receiver Should Be Appointed to Protect and Preserve Plaintiff's Collateral and its Proceeds**

"[T]he decision to appoint a receiver … lies within the discretion of the court."  Consol. Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 326 (1st Cir. 1988).[6]  Some of the factors the Court may consider in deciding whether to appoint a receiver include:  (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.  Canada Life Assur. Co. 563 F.3d at 844.

Although none of these factors alone is alone dispositive, the Ninth Circuit has stated that "foremost among them being whether the property was of insufficient value to insure payment, and whether the defendant was of doubtful

---

[6] "[F]ederal law governs the issue of whether to appoint a receiver in a diversity action."  Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 843 (9th Cir. 2009); Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993) ("The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles."); FED. R. CIV. P. 66.

financial standing."  Id.; see also New York Life Ins. Co. v. Watt West Inv. Corp.,
755 F. Supp. 287, 292 (E.D. Cal. 1991) (explaining the "[m]ost important among
the factors [to consider when appointing a receiver] are the adequacy of the
security and the financial position of the [debtor].").  Each of these factors weighs
in favor of instituting a receivership in this case.

### 1.   Plaintiff Has a Valid Claim.

It is undisputed that Plaintiff is the senior secured creditor of Envy, with a
perfected lien on substantially all of Envy's assets, and a claim of approximately
$3,977,273.50  due under the Note.

### 2.   There is Evidence of Fraudulent Conduct by Envy

In this case, there is evidence that Envy has engaged in fraudulent activity
by, among other things, engaging in "sales out of trust" of at least 123 vehicles and
in creating fictitious rental agreements, some in Chinese, in order to misrepresent
the status of Plaintiff's collateral.  "[F]ederal district courts have not hesitated to
appoint receivers in cases where there is evidence of fraud which could lead to the
dissipation of assets."  Levin v. Garfinkle, 514 F. Supp. 1160, 1163 (E.D. Pa.
1981) (citing Mintzer v. Arthur L. Wright Co., 263 F.2d 823 (3d Cir. 1959)).

Each of these fraudulent activities is a default under the Loan Documents
and justifies appointment of a receiver to step in, and to protect and preserve

Plaintiff's collateral, and take control of Envy's litigation against Volvo, in view of Envy's past fraudulent conduct.

### 3. Plaintiff's Collateral is in imminent danger of being lost concealed, or diminished in value

Plaintiff's collateral consists primarily of new and used vehicles, accounts receivable generated from the sales of those vehicles, the Federal and State Court Lawsuit, and cash proceeds from the sales actually received by Envy, some of which have been diverted to other unknown uses.

2. The Federal Lawsuit and the State Court Lawsuit are valuable assets of Envy and constitute important collateral. <u>First American Bank Valley v. George J. Hegstrom Co., Inc.</u>, 551 N.W.2d 288, 292 (1996) ("Courts uniformly hold that, under the UCC, proceeds of an anticipated recovery from an impending lawsuit constitute general intangibles."). NextGear has no assurances that the lawsuits will be diligently prosecuted by Envy for the benefit of creditors, including NextGear. In particular, in the Federal Lawsuit, Volvo has sought to add counterclaims against Envy and Fedotov as recently as April 6, 2018, filing the Volvo Motion to Supplement Counterclaim. Unless a receiver is appointed to take control the Hawaii federal and state lawsuits, Plaintiff's collateral is in imminent danger of loss or diminishment in value due to lack of diligent prosecution and/or the threat of inadequate settlement of Envy's claims. Plaintiff is particularly concerned since Fedotov is also a defendant in at least one of the cases and, because of his own

self-interest, could prosecute and/or settle the federal and state litigation in a fashion less favorable to Envy and more favorable to him personally.  Further, Fedetov failed to personally attend the mediation in December 2017, and it appears that the August 2018 settlement conference in the Federal Lawsuit, like the mediation, was also unsuccessful.

Unless a receiver is appointed to control the Federal Lawsuit and the State Court Lawsuit, Plaintiff's collateral is in imminent danger of loss or diminishment in value due to lack of diligent prosecution, the conflict caused by Volvo's counterclaims against Envy and Fedotov, and the threat of inadequate settlement of Envy's claims.

### 4.    Legal remedies are inadequate

Envy engaged in a pattern or practice of engaging in "sales out of trust," in failing to remit to Plaintiff the proceeds from the sale of its Collateral. Now, despite NextGear's repossession of hundreds of the vehicles, Defendant Envy is liable for and owes Plaintiff the sum of $3,977,273.50, plus interest at the rate provided in the Note, plus attorneys' fees and costs.

A receiver is necessary in order to ensure that Plaintiff's remaining collateral is protected and maintained, the Federal Lawsuit and the State Lawsuit are diligently prosecuted, and any lawsuit or settlement proceeds are timely remitted to NextGear, the senior secured creditor.  Legal remedies for damages are

inadequate because Envy is likely insolvent and unable to pay its debts as they come due.  Therefore, unless a receiver is appointed to protect and preserve Plaintiff's collateral, Envy may make litigation or settlement decisions to the detriment of Plaintiff and the value of Plaintiff's collateral.

### 5.      The harm to Plaintiff outweighs injury to Envy

As described herein, Envy's handling of the Federal Lawsuit and the State Lawsuit could put Plaintiff in the position of being undersecured or worse, Envy could settle the cases in such a way as to cut Plaintiff out of any proceeds of the lawsuits.

Appointing a receiver will, among other things, ensure that the lawsuits are handled properly, with the interests of NextGear in mind as Envy's largest secured creditor, which will not be unduly injurious to Envy.  Unless a receiver is appointed, Envy may settle the Federal Lawsuit and State Lawsuit for less than the value of Envy's claims, thereby diminishing the value of Plaintiff's collateral.  This could put Plaintiff in the position of having to mount post-hoc challenges to Envy's settlement of the Federal Lawsuit or State Lawsuit in order to protect its collateral.

### 6.      Plaintiff's probable success in the action

The moving party does not have to prove it is conclusively entitled to relief to justify the appointment of a receiver.  The Court need only find that there

is a reasonable probability of success on the merits.  Crowley v. Valley West

Water Co., 882 P.2d 1022, 1027 (Mont. 1994); accord Ratcliff v. Ratcliff, 39

N.E.2d 435, 437 (Ind. 1942).  Here, it is highly likely that Plaintiff will be

successful and will prevail on the merits in this case.  It is uncontroverted that

Envy defaulted under the terms of the Note.  In addition, there is substantial

evidence of financial misconduct, mismanagement, and diversion of funds by Envy

in this case.

### 7.    Plaintiff's interests to be protected will be well-served by receivership

A receiver should be appointed by this Court to preserve the value of

Plaintiff's collateral that secures Plaintiff's loans to Envy.  The diversion of cash

proceeds from the sale of Plaintiff's collateral, and Envy's misrepresentations to

Plaintiff regarding the existence of fictitious rental agreements, is a serious breach

and a default of the Loan Documents.

Receivers have historically been appointed to manage properties.  In many

cases, a receiver to run the business was necessary.  See Ralph E. Clark, Clark on

Receivers § 166, at 250 (3d ed. 1959).  In this case, there has been mismanagement

over Envy's business operations, including the diversion of sales proceeds.

Appointment of a receiver for the limited purposes of protecting and preserving

Plaintiff's collateral and ensuring that the Federal Lawsuit and the State Court

Lawsuit are diligently prosecuted for the benefit of creditors will help to alleviate

the risk of substantial harm to the value of NextGear's collateral due to litigation or settlement decisions made by Envy and Fedotov.  Appointment of a receiver at this point will also serve interests in judicial economy by allowing the receiver to proactively control the litigation, thereby avoiding the need for Plaintiff to mount post-hoc legal challenges to Envy's litigation or settlement decisions.

Courts have found that the appointment of a receiver is warranted where a secured creditor seeks "to avoid a substantial and preventable decline in the value of its collateral" to preserve the property.  See, e.g., U.S. Bank Nat. Assoc. v. Nesbitt Bellevue Property, LLC, 866 F. Supp. 2d 247, 256-57 (S.D.N.Y. 2012); 12 Wright & Miller, Fed. Prac. & Proc. Civ., Appointment of Receivers § 2983 (2d ed. 2015).

**C.  Appointment of a Receiver is Appropriate in this Case.**

Both the Ninth Circuit and the U.S. District Court for the District of Hawaiʻi have looked to state law in guiding their analysis of the appointment of receivers. See Office Depot Inc. v. Zuccarini, 596 F.3d 696, 701 (9th Cir. 2010) ("[b]ecause Rule 66 does not provide a governing rule [on location], we look to state law."); see also LBUBS 2007-C2 Alii Drive, LLC v. Anekona, LLC, No. CIV 09-00114 SOM-BMK, 2010 WL 99362, at *1 (D. Haw. Jan. 12, 2010) (citing to Hawaiʻi state court precedent regarding powers of receivership).   The Hawaiʻi Supreme Court explained:

-21-

> the ultimate purpose of a receivership is to enable the court to accomplish, so far as practicable, complete justice between the parties before it, which includes the preservation and proper disposition of the subject of litigation.   This goal includes the providing of full protection to the parties' rights to the property until a final disposition of the issues . . . .

Hawaii Ventures, 114 Haw. at 457-58, 164 P.3d at 715-16 (brackets omitted).

Appointment of a receiver is appropriate in this case.

**D.      Nomination of Receiver.**

Preservation and protection of Plaintiff's Collateral and ensuring delivery of the sale proceeds to Plaintiff requires a receiver that is experienced in protecting the rights of secured creditors.  If this Motion is granted, Plaintiff requests that the Court consider the appointment of David C. Farmer as Receiver. Mr. Farmer has extensive experience in bankruptcy and insolvency matters and has served as a receiver of several businesses in Hawaiʻi, including the Hawaii Heath Connector. Mr. Farmer has indicated his willingness to serve as receiver in this case at an hourly rate of $275.00, plus expenses.  Mr. Farm's curriculum vitae is attached hereto as **Exhibit "K."**

**CONCLUSION**

Based on the foregoing, supported by the cited points and legal authorities, and based on the evidence contained in the declaration in support of

-22-

this Motion, Plaintiff requests that this Court grant the Motion for Appointment of

Receiver and award Plaintiff all further relief to which it is entitled.

DATED:  Honolulu, Hawaiʻi, October 26, 2018.

_/s/  Johnathan C. Bolton_____
JOHNATHAN C. BOLTON
CHRISTOPHER P. ST. SURE
DYLAN J. TASCHNER

Attorneys for Plaintiff
NEXTGEAR CAPITAL, INC.